AETNA CASUALTY AND SURETY
COMPANY, Appellant,

v.

The STATE BOARD OF INSURANCE
and Texas Workers' Compensation
Insurance Facility, Appellees.

No. 03–93–00541–CV.

Court of Appeals of Texas,
Austin.

May 3, 1995.

Rehearing Overruled June 21, 1995.

Larry Temple, Austin, TX, for Aetna Cas. & Sur. Co.

Dan Morales, Atty. Gen., Maureen Powers, Asst. Atty. Gen., Financial Litigation Div., David C. Mattax, Asst. Atty. Gen., Finance Div., Austin, TX, for State Bd. of Ins.

Charles M. Babb, Babb & Bradshaw, P.C., Austin, TX, for Texas Workers' Compensation Ins. Facility.

Before POWERS, JONES and B.A. SMITH, JJ.

BEA ANN SMITH, Justice.

Appellant Aetna Casualty & Surety Company brought suit for judicial review of an order of the State Board of Insurance [1] (the "Board") denying Aetna's claim for a servicing carrier fee from the Texas Workers' Compensation Insurance Facility (the "Facility"). *See* Tex. Ins.Code Ann. art. 5.76–2, § 2.08(d) (West Supp.1995). The district court affirmed the Board's order. On appeal, Aetna brings six points of error complaining that the Board's action was not supported by substantial evidence, was arbitrary and capricious, and was made through unlawful procedure. We will affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The Facility is a private, non-profit, unincorporated association of insurers authorized to write workers' compensation insurance in Texas for employers who are unable to obtain coverage through private insurance companies.[2] The Facility is required to provide insurance coverage for any risk that appears to be "in good faith entitled to insurance." Tex.Ins.Code Ann. art. 5.76–2, § 4.02(b) (West Supp.1995). Aetna and the Facility entered into an agreement by which Aetna became a servicing carrier for the Facility. As a servicing carrier, Aetna issued and serviced insurance policies on behalf of the Facility, including auditing and collecting all premiums due. Pursuant to the Facility's procedural rules, by which Aetna agreed to be bound, the Facility would pay Aetna a

---

1. The duties of the former State Board of Insurance are now performed by the Commissioner of Insurance or the Texas Department of Insurance, consistent with their respective powers and duties set forth in the Insurance Code. *See* Tex. Ins.Code Ann. arts. 1.01A, .02 (West Supp.1995); *see also* Act of May 27, 1991, 72d Leg., R.S., ch. 242, § 13.01, 1991 Tex.Gen.Laws 939, 1133.

2. The insurer of last resort in Texas has changed names several times. Most documents in the instant cause refer to the association by its for-

mer name, the Texas Workers' Compensation Assigned Risk Pool. The Facility replaced the Pool effective January 1, 1991. Act of Dec. 11, 1989, 71st Leg., 2d C.S., ch. 1, § 17.09(1), 1989 Tex.Gen.Laws 1, 117. On January 1, 1994, the Texas Workers' Compensation Insurance Fund replaced the Facility. Act of Aug. 25, 1991, 72d Leg., 2d C.S., ch. 12, § 18.24(b), 1991 Tex.Gen. Laws 252, 362, *as amended by* Act of May 26, 1993, 73d Leg., R.S., ch. 885, § 8(b), 1993 Tex. Gen.Laws 3512, 3515.

servicing fee "on premiums collected prior to returning to the [Facility] office a premium item as uncollectible." Conversely, the Facility would not pay a servicing fee "on premiums returned as uncollectible, even though later collected by the [Facility] office, attorney, collection agency, or otherwise paid."

As the servicing carrier, Aetna provided workers' compensation insurance coverage ·for Tra–Jax, Inc. from 1987 to 1990. By letter dated August 29, 1990, an Aetna accounts processor notified the Facility in a routine filing that Tra–Jax's premium of $466,634 for the policy year 1989–90 had not been paid and that "this account has been marked off as uncollectible and there is no current coverage in force." At about the same time, Aetna and the Facility learned of possible fraudulent activity by Tra–Jax. The Facility agreed to pay for an outside auditing firm and outside legal counsel to investigate and file suit against Tra–Jax. This investigation revealed, among other things, that Tra–Jax owed more than $300,000 in underpaid premiums for the 1988–89 policy year, in addition to the amounts owed for the 1989–90 policy year. Aetna and the Facility together filed suit against Tra–Jax. Eventually, a settlement was reached in which Tra–Jax agreed to pay a total of $863,000 to Aetna and the Facility. Aetna endorsed the settlement check and forwarded it to the Facility with a request for its standard 26.5% servicing fee. The Facility accepted the settlement check, but denied Aetna's fee request, claiming that Aetna had returned the account as uncollectible and had accepted legal fees not authorized for a servicing carrier, thereby waiving its servicing fee. On appeal, the Board affirmed the Facility's decision. Aetna then brought this suit for judicial review. The trial court affirmed the Board's decision.

**3.** Two factors are used to assess risk in the calculation of workers' compensation insurance premiums: (1) employees are classified according to the risk of the work performed (*e.g.,* carpenters are assigned a higher risk factor than clerical workers); and (2) employers are rated according to their safety record in terms of claims filed. Premium rates based on employee job classification are listed in the *Texas Basic Manual of Rules, Classifications and Rates for Workers Com-*

## THE DISPUTE

Aetna disputes that it ever abandoned collection of the Tra–Jax premiums. After a whistleblower revealed that Tra–Jax had defrauded the Facility by misclassifying a large number of employees in high risk positions as "clerical workers" to avoid high workers' compensation insurance premiums,[3] Aetna filed suit against Tra–Jax and two solvent co-shareholders on behalf of Aetna and the Facility. Aetna asserts that its lawyers, with expertise in investigating insurance fraud, directed the suit and successfully negotiated a settlement of $863,000, representing $320,710 in premiums due for 1988–89, $466,634 in premiums due for 1989–90, plus expenses of $75,656.[4] Aetna insists that it would have had no incentive to file a lawsuit in its own name, or in the Facility's name, if it had not expected to collect its usual servicing allowance. The sum in controversy is 26.5% of $787,344, the total premiums collected, which produces a fee of $208,646.

Aetna admits that its clerk notified the Facility that Aetna was abandoning Tra–Jax's premium for 1989–90 as uncollectible, but explains that this was just a "routine" form letter sent by a low-level employee with "no decision-making authority." Aetna also notes that there is no such formal letter of referral declaring the 1988–89 premium uncollectible. Until the fraud was discovered, Aetna believed that Tra–Jax had failed to pay its premium only for 1989–90 and did not suspect that Tra–Jax had underpaid its premium for 1988–89. Aetna argues that its aggressive role in investigating the fraud, filing the lawsuit, and negotiating a beneficial settlement for the Facility demonstrates that Aetna never abandoned Tra–Jax's premiums in either policy year and therefore had a reasonable expectation of collecting its ordinary servicing fee.

*pensation and Employers' Liability,* a manual promulgated by the Department of Insurance.

**4.** Aetna maintains that the Facility's lawyers played a minor supporting role as local counsel for Aetna's out-of-state attorneys who completely controlled the investigation and settlement efforts.

The Facility relies on the rules set forth in its Procedural Handbook to argue that despite its other actions, Aetna waived its right to collect a servicing fee on the Tra–Jax premiums. The Board agreed. It concluded that under the procedural rules governing servicing companies, Aetna waived any right to collect its servicing fee by declaring the Tra–Jax account uncollectible and referring it to the Facility for collection, and by allowing the Facility to pay legal and accounting fees incident to collection that are ordinarily an expense of the servicing carrier.

### DISCUSSION

■ In its first four points of error, Aetna asserts that the Board's order is not supported by substantial evidence and is arbitrary and capricious. *See* Administrative Procedure Act ("APA"), Tex.Gov't Code Ann. § 2001.174(2)(E), (F) (West 1995). Specifically, Aetna complains of the Board's findings and conclusions that Aetna designated the account as uncollectible and that Aetna waived its right to a fee by allowing the Facility to pay legal and audit fees to outside firms.

■ In conducting a substantial-evidence review, we must first determine whether the evidence as a whole is such that reasonable minds could have reached the conclusion the agency must have reached in order to take the disputed action. *Texas State Bd. of Dental Examiners v. Sizemore,* 759 S.W.2d 114, 116 (Tex.1988), *cert. denied,* 490 U.S. 1080, 109 S.Ct. 2100, 104 L.Ed.2d 662 (1989); *Texas Health Facilities Comm'n v. Charter Medical–Dallas, Inc.,* 665 S.W.2d 446, 453 (Tex.1984). We may not substitute our judgment for that of the agency and may consider only the record on which the agency based its decision. *Sizemore,* 759 S.W.2d at 116. The appealing party bears the burden of showing a lack of substantial evidence. *Charter Medical,* 665 S.W.2d at 453. The appealing party cannot meet this burden merely by showing that the evidence preponderates against the agency decision. *Id.* at 452. Agency decisions that are not sup-

ported by substantial evidence are deemed arbitrary and capricious. *Public Util. Comm'n v. Gulf States Utils. Co.,* 809 S.W.2d 201, 211 (Tex.1991); *Charter Medical,* 665 S.W.2d at 454.

The Facility's Procedural Handbook established the following procedures regarding servicing carrier fees:

23. *COLLECTION POLICY*

   A. *Servicing Carriers*

      . . . .

      (3) If the servicing carrier cannot collect monies due, it will refer the item to the [Facility] for collection within ten (10) days. The servicing carrier by this action waives any right to a servicing allowance on any monies due which are subsequently collected. . . .

32. *SERVICING COMPANY ALLOWANCE*

      . . . .

      The Servicing Allowance is to be paid on premium collected prior to returning to the [Facility] Office a premium item as uncollectible. No Servicing Allowance will be paid on premiums returned as uncollectible, even though later collected by the [Facility] Office, Attorney, Collection Agency, or otherwise paid.

The Facility relies on the following series of letters as evidence that Aetna had returned the Tra–Jax account as uncollectible: (1) On June 20, 1990, Pamelia Pride, an Aetna accounts processor, notified Tra–Jax that its account would be referred to the Facility for collection if its payment of $466,634, due from a final audit, was not received within ten days; (2) on August 29, 1990, Pride sent a memorandum to the Facility that Tra–Jax's account had been marked off as uncollectible and that there was no current coverage in force (referring to policy year 1989–90); (3) on October 11, 1990, the Facility Collections Department sent a letter to Tra–Jax demanding payment within ten days for the $466,634 premium that was due

and in default for 1989–90 and copied Aetna on this correspondence; (4) on November 3, 1990, the Facility referred the account to its outside legal counsel, requesting that counsel take the necessary legal steps to collect Tra–Jax's debt in the amount of $466,634; (5) on November 8, 1990, the Facility's collections clerk asked Aetna to immediately furnish its auditor's worksheets for the Tra–Jax account so the matter could be turned over to the Facility's counsel.

■ Under the rules of the Procedural Handbook outlined above, Aetna was entitled to a servicing allowance on all premiums received for which it was the servicing carrier, unless it had referred the account to the Facility as uncollectible. Thus, in order to avoid its obligation to pay Aetna the agreed-upon percentage as a servicing allowance, the Facility had the burden to prove that the account had been returned to it as uncollectible. *See Travelers Ins. Co. v. Brown,* 402 S.W.2d 500, 504 (Tex.1966) ("One who is relieved of his contractual obligations by a contingent event or occurrence has the burden of proving the happening of the event or occurrence.").

Although there was no formal referral of the premium for 1988–89, the Facility learned of Tra–Jax's fraudulent misreporting and underpayment for that year (and possibly earlier years) only after Aetna referred the Tra–Jax account to the Facility as uncollectible. There is other evidence in the record on which the Board could have relied in determining that Aetna had returned Tra–Jax's account for the Facility to collect whatever sums were due and payable. The record reveals that only one lawsuit was filed to investigate Tra–Jax's fraudulent and wrongful underpayment of premiums. We conclude that the letters relied on by the Facility, read in conjunction with the Procedural Handbook, constitute substantial evidence that Aetna returned the Tra–Jax account to the Facility as uncollectible.

■ The Facility reimbursed Aetna $67,000 for outside legal fees and auditing

fees incurred in pursuing the lawsuit against Tra–Jax and its co-shareholders. Aetna vehemently denies that it ever agreed to waive its servicing fee in exchange for the Facility's fronting these expenses. Aetna argues persuasively that it would never have pursued the lawsuit if it had not had a stake in recovering a percentage of the premiums collected. Aetna also implies that it would never have agreed to accept $67,000 in legal and auditing fees in exchange for $208,646 in servicing fees. However, the evidence as to the parties' agreement is conflicting. On August 16, 1990, the Facility's executive director assured Aetna of the Facility's eagerness to assist in the investigation: "As a part of supporting Aetna in this effort, the [Facility] would be happy to share in the expense of this investigation." On August 29, John Luthringer of Aetna responded, "I understood that the [Facility] would reimburse Aetna for all of our expenses on this matter. Did I misunderstand you?" On October 1, Charles MacKay of the Facility could not recall any such agreement: "It seems to me, John, that Aetna should be expected to at least carry the burden of paying for your own internal expense since in my opinion this would be considered an ordinary expense under your servicing carrier contract." If substantial evidence supports either an affirmative or negative finding that Aetna waived its right to collect a servicing fee, we must resolve any ambiguities in favor of the agency decision. *See Auto Convoy Co. v. Railroad Comm'n,* 507 S.W.2d 718, 722 (Tex.1974). "Resolution of factual conflicts and ambiguities is the province of the administrative body and it is the aim of the substantial evidence rule to protect that function." *Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer,* 662 S.W.2d 953, 956 (Tex.1984).

Here the agency decision comports with the Facility's procedural rules that a servicing company is *not* entitled to reimbursement for legal fees (and by analogy other expenses) incurred in the collection of premiums. As a carrier, Aetna is charged with knowledge of the Facility's Servicing Company Agreement, which provides:

All costs and expenses incident to its functions as a Servicing Company and the servicing of risks assigned to it, including but not limited to office maintenance, salaries, personnel expenses, and the payment of premium tax and bureau assessments, shall be paid by Carrier except that the following expenses shall be recoverable from the [Facility]: authorized legal expenses as defined in the [Facility's] Procedural Handbook.

The Procedural Handbook authorizes legal expenses incurred in litigating liability for claims filed under the workers' compensation policy issued, but does not authorize legal fees incurred in collecting a premium, which is one of the duties the servicing carrier assumes in exchange for receiving a servicing fee. The record of the hearing before the Board reflects that the Board relied on Aetna's acceptance of reimbursement for legal expenses and auditing expenses as evidence that it had turned over to the Facility the collection of premiums on the Tra–Jax account. If legal fees incurred in collecting a premium are properly the expense of a servicing carrier, Aetna was not entitled to accept such reimbursement and still claim a servicing fee. It seems harsh to deny Aetna $208,646 in fees because it asked for and received $67,000 in legal fees it was not entitled to receive. A reviewing court, however, does not sit to substitute its judgment for the agency's decision. We are not called upon to determine whether the decision was correct, but whether reasonable minds could have reached the Board's decision on the record evidence, including evidence of the Facility's procedural rules. The Board determined that accepting legal fees was inconsistent with a carrier's obligation to bear the expenses of premium collection and thus constituted a waiver of the servicing fee. *See North Alamo Water Supply Corp. v. Texas Dep't of Health*, 839 S.W.2d 448, 455 (Tex.

App.—Austin 1992, writ denied) (agency's interpretation of its own rules is entitled to substantial weight). We hold that the Board could reasonably conclude that Aetna waived its right to accept a servicing fee on the premiums recovered by accepting legal fees that are not authorized to be paid to a servicing carrier. Because there is substantial evidence in the record to sustain the Board's denial of Aetna's servicing fee on the Tra–Jax premiums, we overrule Aetna's first four points of error.

In its fifth and sixth points of error, Aetna challenges the Board's action in rejecting the hearings officer's proposal for decision without explanation as being arbitrary and capricious and an unlawful procedure. The record reflects that the hearings officer prepared a proposal for decision that would have awarded Aetna its fee for the 1988–89 policy year and denied it for the 1989–90 policy year. The Board rejected this proposal, however, and issued an order denying all relief to Aetna. The Board's final order does not explain directly why the proposal for decision was rejected. Aetna contends that "[w]hile the Board is not compelled to adopt a Proposal for Decision submitted to it, it is required to explain the reason and basis for its rejection of the recommendation of its own Hearings Officer."

A hearings officer has no power to bind an agency with a proposal for decision. *Ross v. Texas Catastrophe Property Ins. Ass'n*, 770 S.W.2d 641, 642 (Tex.App.—Austin 1989, no writ). Thus, an agency is free to reject a hearings officer's proposal for decision. In the present case, the final order of the Board did not adopt any portion of the hearings officer's proposal. The APA contains no provision directing the Board to explain its reasoning in rejecting the report of its hearings officer.[5] In reviewing an agency's decision, we examine the agency's

---

5. We note that the APA does provide that a state agency may change findings of fact or conclusions of law made by an administrative law judge employed by the State Office of Administrative Hearings only for reasons of policy and must state in writing the reason and legal basis for such a change. APA § 2001.058(e). However, the APA contains no similar requirement for other hearings officers. The record reflects that the hearings officer in this case was not employed by the State Office of Administrative Hearings.

final order and any statements in reports that were adopted by the agency in its final order. *See Public Util. Comm'n v. AT & T Communications,* 777 S.W.2d 363, 366 (Tex. 1989). We are not permitted to impose additional fact-finding requirements or otherwise require an agency to explain its reasoning beyond the requirements of the APA, even if judicial review would be thereby enhanced. *Charter Medical,* 665 S.W.2d at 451; *Buttes Resources Co. v. Railroad Comm'n,* 732 S.W.2d 675, 682 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.).

Although not required to do so, the Board explained its rejection of the hearings officer's proposal in a manner that facilitates our review of its final order. The Findings of Fact and Conclusions of Law reflect the Board's conclusion that Aetna waived its right to any servicing fee under the applicable procedural rules both by declaring the Tra–Jax account uncollectible and by allowing the Facility to pay outside legal and audit fees incident to collecting the sums owed by Tra–Jax. Only one lawsuit was filed to investigate fraud and collect premiums from Tra–Jax; the Facility reimbursed Aetna $67,000 for legal and audit fees incurred in pursuing this single cause of action. The Board's conclusion that by accepting unauthorized legal fees Aetna waived its servicing fee on any sums collected in the lawsuit explains the Board's denial of any fee, without distinction between the policy years. We agree with the trial court that there was sufficient evidence in the record to sustain the Board's decision and overrule points of error five and six.

## CONCLUSION

We affirm the district court's judgment and uphold the Board's order denying Aetna its servicing fee on the Tra–Jax premiums.

JONES, Justice, concurring and dissenting.

The record contains persuasive evidence that when Aetna's accounts processor, Pamelia Pride, informed the Facility that Tra–Jax's premium for the 1989–90 policy year was uncollectible, she was not aware that lawyers and auditors retained by Aetna were aggressively pursuing that very premium on Aetna's behalf. Nonetheless, weighing all the evidence, I believe the Board's determination that Aetna is not entitled to its servicing fee for the 1989–90 policy year is supported by substantial evidence. Accordingly, I concur in that portion of the majority's decision.

As to the 1988–89 policy year, however, I can find no evidence whatsoever—much less substantial evidence—to support the Board's determination. Accordingly, I respectfully dissent from the portion of the majority's decision dealing with that policy year.

The majority concludes that Aetna waived its right to a servicing fee (1) by designating the Tra–Jax account as uncollectible, and (2) by allowing the Facility to pay outside legal and audit fees. The first basis is insupportable for several reasons. All correspondence from Aetna to the Facility purporting to return a Tra–Jax account as uncollectible specifically referenced the 1989–90 policy year. In addition, all such correspondence specifically referenced the sum of $466,634, the precise amount determined to be due from Tra–Jax for the 1989–90 policy year. Finally, Aetna had no motivation whatsoever to become the lead plaintiff in the lawsuit against Tra–Jax, thereby incurring substantial litigation expenses, unless it stood to collect at least some of its servicing fees on the unpaid premiums. The series of letters cited by the majority are silent as to any premium due for the 1988–89 policy year. Under the rules of the procedural handbook, Aetna was to demand payment of any additional premium due before returning the account to the Facility. Nothing in the record suggests when the premium for the 1988–89 policy year became due, or if demand for its payment was made to Tra–Jax. Instead of providing support for the Board's determination, therefore, the letters actually support Aetna's position that the Facility did not meet its burden of proving that Aetna waived its servicing fee by returning Tra–Jax's 1988–89 account as uncollectible.

The second basis cited by the majority—that Aetna waived its right to a servicing fee by allowing the Facility to pay outside legal and audit fees—is equally insupportable. The record reveals that the Facility advised Aetna by letter that the Facility was "eager to assist Aetna in any way in its investigation of Tra–Jax, Inc. As a part of supporting Aetna in this effort, the [Facility] would be happy to share in the expense of this investigation." When Aetna sought clarification of the expense-sharing agreement being offered by the Facility, the Facility's representative responded as follows:

> It was my understanding when you originally telephoned me that you wanted the [Facility] to pick up the additional expense of hiring an attorney and a professional premium audit firm to assist in the investigation of this account. I do not recall any suggestion that the [Facility] would reimburse Aetna for *all* of your expenses on this matter.
>
> ... Aetna should be expected to at least carry the burden of paying for your own internal expense since in my opinion this would be considered an ordinary expense under your servicing carrier contract.

Ultimately, Aetna did bear its own internal expenses, while the Facility paid the legal and audit fees of outside firms.

Waiver is an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right. *Sun Exploration & Prod. Co. v. Benton,* 728 S.W.2d 35, 37 (Tex.1987). Allowing the Facility to pay for outside legal and audit expenses does not, in my opinion, raise an inference that Aetna intended to waive its standard fee. Indeed, the Facility's letter quoted above seems to concede that bearing its own internal expenses was all Aetna was obligated to do under its servicing carrier contract. Beyond that, the issue of who would pay for *outside* expenses was simply a matter to be negotiated between the parties. It is critical to an appreciation of the parties' actions to understand that this was not the run-of-the-mill suit to collect premiums contemplated by the servicing carrier agreement. Rather, it was a highly unusual case of fraud, and the servicing carrier agreement did not address who would pay investigation and litigation expenses in such cases. Thus, there was no showing that the fee-sharing arrangement was inconsistent with the servicing carrier agreement. Nor does the evidence show that Aetna intended to relinquish its right to a servicing carrier fee or that allowing the Facility to pay for outside legal and audit expenses was inconsistent with Aetna's right to that fee. In my opinion, the record does not contain substantial evidence to support the Board's finding of waiver as to the 1988–89 policy year. I would sustain Aetna's first four points of error and reverse the portion of the trial court's judgment affirming the Board's order as to the 1988–89 policy year.