# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-01-00371-CV

**Texas Workers' Compensation Insurance Facility, Appellant**

**v.**

**Comptroller of Public Accounts and The Attorney General of the State of Texas,[1] Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
## NO. 97-03602, HONORABLE PAUL DAVIS, JUDGE PRESIDING

Appellant Texas Workers' Compensation Insurance Facility (the Facility) seeks a refund of roughly $24,000,000 from the Comptroller for taxes it claims it paid. The tax at issue is the maintenance tax surcharge paid by insurance companies that write workers' compensation insurance policies. *See* Tex. Ins. Code Ann. art. 5.76-5, § 10(a)(1) (West Supp. 2002). Although the Facility was an association of workers' compensation insurance companies, it was not an insurance company itself and thus was not subject to the tax. *See id.* § 10(a). It was, however, required to reimburse its member companies for the taxes they paid. *See* 28 Tex. Admin. Code

---

[1] A suit for a tax refund must be brought against both the Comptroller of Public Accounts and the Attorney General. Tex. Tax Code Ann. § 112.151 (West 1992).

§ 1.411 (1993) (repealed) ("Rule 1.411").[2]  The Facility asserts that it is entitled to a refund because: (1) it effectively paid the tax by reimbursing the member companies even though it was not subject to the tax; and (2) the Department of Insurance exceeded its authority by adopting Rule 1.411, which required the Facility to reimburse the companies for the tax when the Facility was not itself subject to the tax under article 5.76-5, section 10(a).  *See* Tex. Ins. Code Ann. art. 5.76-5, § 10(a) (West Supp. 2002).

We hold that: (1) the member insurance companies, not the Facility, paid the tax; (2) Rule 1.411 is valid and the Facility's reimbursement obligation was a lawful component of the legislative scheme under which the Facility operated; (3) the Facility's role in reimbursing its servicing companies does not convert the Facility into a taxpayer; and (4) the Facility has not met the statutory prerequisite for a tax refund.  We therefore reject the Facility's claim for a tax refund and affirm the judgment of the trial court.

### The Involuntary Market

Under the Texas Workers' Compensation Act, an employer may obtain workers' compensation insurance coverage through a licensed insurance company or, in certain instances, through self-insurance.  *See* Tex. Labor Code Ann. § 406.003 (West 1996).  Many employers who are unable to purchase insurance in the private voluntary market also are ineligible to self-insure.

---

[2] The tax collection division of the Department of Insurance was transferred to the Office of the Comptroller.  *See* Act of May 30, 1993, 73d Leg., R.S., ch. 685, § 3.01, 1993 Tex. Gen. Laws 2559, 2576.  The Comptroller subsequently adopted Rule 1.411 as Rule 3.804; neither rule remains in force, however, as maintenance tax rates are re-determined each year.  *See* 21 Tex. Reg. 9434 (1996).

2

Since 1953, the Texas legislature has prescribed a variety of "residual" or "involuntary" market mechanisms to afford coverage to these "rejected risks," that is, those employers who are unable to obtain workers' compensation insurance through ordinary methods in the voluntary market. *See* Act of May 14, 1953, 53d Leg., R.S., ch. 279, § 1, 1953 Tex. Gen. Laws 716, 716-18, *repealed by* Act of Dec. 11, 1989, 71st Leg., 2d C.S., ch. 1, § 16.01(21), 1989 Tex. Gen. Laws 1, 114-15.

The legislative scheme has changed over the years. The coverage was initially provided by the Texas Workers' Compensation Assigned Risk Pool,[3] then by the Facility,[4] and currently by the Texas Mutual Insurance Company,[5] which was initially established as the Texas Workers' Compensation Insurance Fund.[6] From the beginning, the legislative design has remained constant in one regard: The cost of providing involuntary coverage was placed on all insurance companies that write workers' compensation policies as a proportional cost of their business in the

---

[3] *See* Act of May 14, 1953, 53d Leg., R.S., ch. 279, § 1, 1953 Tex. Gen. Laws 716, 716-18, *repealed by* Act of Dec. 11, 1989, 71st Leg., 2d C.S., ch. 1, § 16.01(21), 1989 Tex. Gen. Laws 1, 114-15.

[4] *See* Act of Dec. 11, 1989, 71st Leg., 2d C.S., ch. 1, § 13.11, 1989 Tex. Gen. Laws 1, 89 (adding former Insurance Code article 5.76-2), *amended by* Act of Aug. 25, 1991, 72d Leg., 2d C.S., ch. 12, § 18.07, 1991 Tex. Gen. Laws 252, 342-350, *repealed by* Act of June 1, 1997, 75th Leg., R.S., ch. 594, § 3.01(1), 1997 Tex. Gen. Laws 2076, 2081 (repealing former Insurance Code article 5.76-2). For convenience and because the parties cite to the now repealed article 5.76-2 of the Insurance Code, we will cite to former article 5.76-2 throughout this opinion.

[5] *See* Act of May 27, 2001, 77th Leg. R.S., ch. 1195, § 2, 2001 Tex. Gen. Laws 2701, 2701 (West) (currently codified at Tex. Ins. Code Ann. art. 5.76-3, § 2 (West Supp. 2002))

[6] *See* Act of Aug. 25, 1991, 72d Leg., 2d C.S., ch. 12, § 18.18, 1991 Tex. Gen. Laws 252, 358, (now codified, as amended, at Tex. Ins. Code Ann. art. 5.76-4 (West Supp. 2002)).

state,[7] not on taxpayers generally. Indeed, the legislature has expressly prohibited the expenditure of public funds for costs associated with providing involuntary insurance.[8]

*The Facility*

The Facility, which was responsible for providing involuntary insurance from 1991 through 1993, was a non-profit association that all independent insurance companies licensed to write workers' compensation insurance in Texas were required to join. *See* Act of Dec. 11, 1989, 71st Leg., 2d C.S., ch. 1, § 13.11, 1989 Tex. Gen. Laws 1, 89-97 (amended 1991, repealed 1997) (formerly codified as Texas Insurance Code art. 5.76-2) (hereafter art. 5.76-2). More than three hundred such insurance companies were authorized by the Board of Insurance as eligible "servicing companies" of the Facility. *See* art. 5.76-2, §§ 1.01(11), 4.08. After determining that a company was entitled to involuntary coverage, the Facility would contract with one of its servicing companies, who in turn issued and serviced the policy, including auditing and collecting premiums, on its behalf. *See*

_____

[7] *See* Act of Apr. 9, 1953, 53d Leg., R.S., ch. 279, § 1, 1953 Tex. Gen. Laws 716, 717 (*repealed* 1989) (stating that "[i]t shall be the duty of companies and associations, [that is,] members of the [Pool] . . . to provide insurance . . . for any risk under the Workmen's Compensation Law of Texas . . . which risk shall have been tendered to and rejected by any member of [the Pool]"); art. 5.76-2, §§ 2.06, 4.03) (providing that the Facility shall pay all of its operational costs and the costs of operating and maintaining the rejected risk fund); Tex. Ins. Code Ann. art. 5.76-5 (West Supp. 2002) (authorizing issuance of revenue bonds to fund workers' compensation insurance coverage, and assessing a maintenance tax surcharge to finance the bonds on workers' compensation insurers and the Fund).

[8] *See, e.g.*, art. 5.76-2, §§ 2.06, 4.03 (prohibiting the payment of public funds for costs or expenses incurred in the operation and maintenance of the facility or of the rejected risk fund).

art. 5.76-2, §§ 1.01(11), 4.02(b); *see also All Star Metal & Roofing, Inc. v. Texas Dep't of Ins.*, 935 S.W.2d 186, 187, n.2 (Tex. App.—Austin 1996, no writ). The Facility ceased writing workers' compensation insurance on December 31, 1993, and the Fund replaced it as the insurer of last resort.[9]

Although the legislature terminated the Facility in favor of the Fund, it maintained the statutory scheme of making insurance companies responsible for the cost of the involuntary market. In 1991, it enacted a law requiring the Texas Public Finance Authority to issue revenue bonds to finance the creation of the Fund. *See* Act of Aug. 25, 1991, 72d Leg., 2d C.S., ch. 12, § 18.19, Tex. Gen. Laws 252, 358 (currently codified at Tex. Ins. Code Ann. art. 5.76-5 (West Supp. 2002)).[10] All insurance companies collecting workers' compensation premiums must pay a proportionate share of the cost of servicing the bonds by paying a maintenance tax surcharge based on their correctly reported gross premiums. *See* Tex. Ins. Code Ann. arts. 5.76-5, § 10(b), 5.68 (West Supp. 2002).[11]

These provisions were in effect during the final years of the Facility's existence. The servicing companies paid the surcharge and the Facility was required to reimburse them. *See* Rule 1.411(d)(1). Likewise, the Facility was entitled to recoup the reimbursed amounts from policy

---

[9]  In 1997, a law was enacted that converted the Facility into a stock insurance company and transferred control to a third party. *See* Act of June 1, 1997, 75th Leg., R.S., ch. 594, §§ 1.01-1.14, 1997 Tex. Gen. Laws 2076, 2076-2079. The Facility is now the Facility Insurance Company (FIC). FIC is authorized to enforce the rights and powers of the Facility. *Id.* §§ 1.01, 1.06. The Act further provides that causes of action by the Facility are unaffected by the conversion but continue to be governed by former article 5.76-2. *See id.* § 1.06(f).

[10]  In addition, the bonds are to: "(1) establish the initial surplus of the fund; (2) establish and maintain reserves; (3) pay initial operating costs; (4) pay costs related to issuance of the bonds; and (5) pay other costs related to the bonds as may be determined by the [Texas Public Finance Authority]." Tex. Ins. Code Ann. art. 5.76-5, § 3 (West Supp. 2002).

[11]  Also subject to the surcharge are self-insurers and the Fund. Tex. Ins. Code Ann. art. 5.76-5, § 10(a) (West Supp. 2002).

holders by setting premium rates to reflect the surcharge. *See* Tex. Ins. Code Ann. art. 5.76-5, § 10(d) (West Supp. 2002) (authorizing insurance companies to pass the cost of the surcharge through to their policy holders); Rule 1.411(d)(2) (mandating that insurance companies that are also servicing companies of the Facility must implement the section 10(d) pass-through procedure and remit all funds received to the Facility). In the last year of its operation, the Facility decided to impose a recoupment rate of three percent on policy holders even though this was inadequate to cover surcharge costs and a shortfall resulted.[12]

Under the Facility's governing statute, it passed through any operational deficit or surplus to its members in the form of an assessment or rebate; the Facility also had the option of recovering a deficiency through involuntary insurance rates. *See* art. 5.76-2, §§ 4.04;[13] 4.05(e). Rule 1.411 reflected the Facility's governing statute by authorizing the Facility to recover a deficiency between the cost of the surcharge and the amount recouped from the insureds either by assessments against its members or recovery through its rates. *See* Rule 1.411(d)(4). The Facility previously assessed its members for the approximately $24,000,000 deficiency at issue here. The Facility now seeks to recover this money again in the form of a tax refund.

The Facility asserts that it reimbursed the servicing companies a total of $40,874,608 for surcharges paid in 1992, 1993, and 1994. Of that amount, $16,665,658 was recouped from policy

---

[12] The Facility's private auditor had recommended a six percent recoupment rate.

[13] The legislation that established the Facility as the insurer of last resort originally allowed the entity to pass through any operational deficits to its members. *See* Act of Dec. 11, 1989, 71st Leg., 2d C.S., ch. 1, § 13.11, 1989 Tex. Gen. Laws 1, 89-97 (amended 1991, repealed 1997). Subsequent amendments to the Facility's governing statute additionally provided for operational surpluses to be rebated to members. *See* Act of Aug. 25, 1991, 72d Leg., 2d C.S., ch. 12, § 18.13, 1991 Tex. Gen. Laws 252, 345 (repealed 1997).

holders, causing the Facility to seek a refund of the remaining $24,208,950. In the alternative, it seeks a partial refund for reimbursements of $5,110,924 paid in 1993 and 1994. It asserts that $3,928,081 was reimbursed in 1994, but because the Facility ceased writing policies at the end of 1993, it was unable to recoup any of that amount from policy holders. It also states that $1,182,843 paid as reimbursement in 1993 could not be recouped because the Facility's policies were rapidly dwindling in number toward the end of 1993. Together, this totals $5,110,924. The Comptroller disagrees that the Facility was unable to make up the difference because of declining policies; instead, the Comptroller maintains that the Facility had the opportunity to recover the deficiency but deliberately chose to set an inadequate recoupment rate. In summary, the Facility seeks either a full refund of all reimbursements paid in the amount of $24,208,950, or a partial refund of $5,110,924 for reimbursements paid in 1993 and 1994 that the Facility claims it was unable to recoup because it had ceased writing policies.

The Facility first sought a refund from the Comptroller. *See* Tex. Tax Code Ann. § 111.104(a) (West Supp. 2002). After the Comptroller denied the claim, the Facility filed suit in district court seeking the refund. *See id.* § 112.151 (West Supp. 2002) (authorizing suit); Tex. Tax Code Ann. § 112.154 (West 1992) (providing for a trial *de novo*). Both the Facility and the Comptroller filed cross-motions for summary judgment. The trial court denied the Facility's motion but granted the Comptroller's motion. The Facility raises three issues. In its first and second issues, it asserts that the court erred in denying its motion and granting the Comptroller's motion. It challenges certain evidentiary rulings in its third issue.

**DISCUSSION**

7

*Standard of Review*

A defendant moving for summary judgment must establish as a matter of law that there is no genuine issue of material fact as to one or more of the essential elements of the plaintiff's cause of action. *Wilmer v. Laidlaw Waste Sys. (Dallas), Inc.*, 890 S.W.2d 459, 463 (Tex. App.—Dallas 1994), *aff'd*, 904 S.W.2d 656 (Tex. 1995); *Starcrest Trust v. Berry*, 926 S.W.2d 343, 354 (Tex. App.—Austin 1996, no writ). A plaintiff, as movant in a summary judgment proceeding, has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985); *Wilmer*, 890 S.W.2d at 463. In deciding whether a disputed material fact issue exists, we accept as true evidence favorable to the nonmovant. *Nixon*, 690 S.W.2d at 548-49. We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Id.* at 549. When the parties file competing motions for summary judgment and one is granted and the other denied, the reviewing court should review the summary-judgment evidence presented by both sides and determine all questions presented. *Commissioners Court v. Agan*, 940 S.W.2d 77, 81 (Tex. 1997).

*Evidentiary Issues*

The Facility objected to the affidavits and a deposition of Gary Johnson, an employee in the Comptroller's office, and Nancy Moore, Deputy Commissioner of the Workers' Compensation division of the Department of Insurance. The Facility asserted that portions of the affidavits and deposition were conclusory and thus insufficient to support summary judgment. *See* Tex. R. Civ. P.

166a(f).[14]  Although the Facility renews its objections to this evidence on appeal, it brings the evidentiary issues "primarily to keep the record clean."  The trial court explained at the hearing on the Facility's objections that it was not admitting the evidence as proof of the legally correct interpretation of the statute or rule, but rather as evidence of the Department's characterization of a statute or of its own policy.  Nevertheless, the Facility wants to protect against the impression that the evidence was relied on by the trial court as the definitive interpretation of a statute or rule.  We are aware of, and the record reflects, the limited purposes for which the evidence was admitted.  We therefore overrule the Facility's third issue.

### Who Paid the Tax?

The Facility goes to great lengths to explain that it was not an insurance company and thus was never subject to the tax.  *See* Tex. Ins. Code Ann. art. 5.76-5, § 10(a) (West Supp. 2002) (expressly providing for the surcharge to be assessed against three entities, none of which is the Facility).  Therefore, it argues that it should receive a refund of the amount it reimbursed its servicing companies for the tax, reasoning that by reimbursing its companies, it *effectively* paid the tax.  The Comptroller agrees that the Facility was not an insurance company.  It responds, however, that the Facility's argument misses the point because the liability for the surcharge did not stem from a tax assessed against the Facility; rather, the liability was imposed on the insurance companies as a cost of doing business in the state.  *See id.* § 10.

---

[14] "Supporting and opposing affidavits [for summary judgment] shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Tex. R. Civ. P. 166a(f).

Although the Facility's governing statute did not mandate that its servicing companies be insurance companies, *see* article 5.76-2, sections 1.01(11), 4.08, all of its servicing companies were. As *insurance companies*, the servicing companies were subject to the maintenance tax surcharge; the surcharge was based on both their voluntary business and their policies written through the Facility. *See* Tex. Ins. Code Ann. art. 5.76-5, § 10 (West Supp. 2002); Rule 1.411(a). As *servicing companies*, they were entitled to reimbursement from the Facility for the surcharge paid on Facility business. *See* Rule 1.411(d)(1). Rule 1.411 implemented section 10 of Insurance Code article 5.76-5 by establishing the rate of the maintenance tax surcharge; it also established specific procedures to govern the Facility and its servicing companies. *See* Rule 1.411(a), (d). At the hearing to consider and adopt Rule 1.411, Nancy Moore, representing the Department of Insurance, explained:

> Subpart (d) addresses the Workers Compensation Insurance Facility and how they [sic] will handle the recoupment with their servicing companies. *Because the facility reinsures 100 percent of the business written through its servicing companies the proposed amendment would require the facility to reimburse each servicing company for the proportion of its surcharge which was attributable to their facility business.* Thereafter the servicing company must collect the recoupment from its policy holders through the add-on method and remit the amount collected to the facility.[15]

(Emphasis added.) The provisions of Rule 1.411 and the comments during the proceedings clearly indicate that the Facility was not directly liable for the tax. The Facility has admitted that it never remitted the surcharge to the Comptroller or Department of Insurance. While the Facility was

_____

[15] A representative for the Facility had attended a previous hearing to consider the proposed rule.

required to reimburse its servicing companies, its obligation to do so was an incident of its statutory and contractual relationship with the companies, against whom the surcharge was directly assessed. The Facility did not stand in a direct taxpayer relationship with the Comptroller and its reimbursement to the servicing companies cannot establish this relationship. *See* Tex. Tax Code Ann. § 111.104(a) (West Supp. 2002) (stating that the comptroller shall credit any amount of tax erroneously or unlawfully collected "against any other amount when due and payable by the *taxpayer from whom the amount was collected*) (emphasis added).

The Facility then argues that its servicing companies paid the tax as agents of the Facility and thus the Facility paid the tax. The Comptroller responds that there is no evidence indicating that the servicing companies paid the surcharge on behalf of the Facility. The tax does not distinguish between an insurance company's liability for its voluntary and involuntary business. *See* Tex. Ins. Code Ann. art. 5.76-5, § 10 (West Supp. 2002); *see also* Rule 1.411(a)(2),(3). Nor did the servicing companies distinguish or apportion their liability for Facility policies according to the affidavit of Gary Johnson, an employee with the Comptroller's office. Johnson similarly testified during his deposition. Attached to Johnson's affidavit were two sample returns of servicing companies. The returns do not show separate categories for Facility and voluntary business for purposes of reporting the maintenance tax surcharge.

The Comptroller's evidence indicates that the insurance companies paid the surcharge on Facility business as part of the tax on their total gross premiums. This undermines the Facility's suggestion that the companies paid any tax as the Facility's agents. Moreover, the Facility seems to concede this point in another part of its brief when it states that "[a]lthough servicing companies were

11

authorized to perform essential functions of the Facility, they are not subject to the maintenance tax in that capacity." We hold that the servicing companies paid the surcharge; the Facility did not.

*Validity of Rule 1.411*

Although the Facility followed the procedure established by Rule 1.411 during its operations without complaint, it now contends that the rule was invalid. The Facility reasons that since the statutory provision authorizing the maintenance tax surcharge does not list the Facility as one of the entities subject to the tax, it was outside of the Department's authority to make it liable for reimbursement of the tax under Rule 1.411.

The Comptroller responds first that the Facility has waived any complaint regarding the rule because it failed to challenge it within 30 days of its enactment, as it would have been required to do under its former statute. *See* art. 5.76-2, § 2.09(a).[16] The Comptroller also contends that the Facility should be estopped from challenging Rule 1.411 because it acquiesced in the rule by accepting recoupment when the cost of reimbursing the insurance companies was passed through to policy holders and remitted to the Facility. *See* Rule 1.411(d)(2). Finally, the Comptroller maintains the Department of Insurance properly required it to make the reimbursement as part of the statutory scheme of maintaining an involuntary market. We will assume without deciding that the Facility may complain about the validity of Rule 1.411 in this appeal and will uphold the rule.

---

[16] "If the fund or facility is adversely affected by an act or decision of the board, it may make a written request for reconsideration to the board not later than the 30th day after the act or decision." Art. 5.76-2, § 2.09(a).

12

Rule 1.411 was promulgated by the Department under the authority of article 5.76-2 and Insurance Code article 5.76-5 to implement the maintenance tax surcharge. *See* Rule 1.411; *see also American Home Assurance v. Texas Dep't of Ins.*, 907 S.W.2d 90, 92 (Tex. App.—Austin 1995, writ denied). We have previously approved Rule 1.411 in a related challenge. *See American Home Assurance*, 907 S.W.2d at 96-97. In that case, we concluded that Rule 1.411 effectuated the legislative purpose of the statutory pass-through provision and was a "reasonable interpretation of the statute by officials assigned responsibility for administering the scheme." *Id*. at 96.

Furthermore, the Comptroller argues that as a quasi-public entity created by legislative decree, the Facility was obligated to operate pursuant to its governing statute and rules adopted by the Department of Insurance, including Rule 1.411.[17] The Comptroller maintains that the Facility, through its successor entity, should not now be allowed to circumvent those rules. The Facility's former governing statute makes it clear that the Facility existed subject to the plenary authority of the Board of Insurance,[18] and later, the Department of Insurance.[19] In addition, the Comptroller contends

[17] *See Southwest-Tex Leasing Co., Inc. v. Bomer*, 943 S.W.2d 954, 959 n.5 (Tex. App.—Austin 1997, no writ) (explaining that the Facility, "although not a state agency, is essentially an arm of the State").

[18] The Board of Insurance was replaced by the Department of Insurance. *See* Act of May 30, 1993, 73d Leg., R.S., ch. 685, § 1.02, 1993 Tex. Gen. Laws 2559, 2561. For convenience, we will use the term "the Department" to refer to both the former and current agency.

[19] *See, e.g.*, art. 5.76-2, § 2.01 (providing that "[f]or the purpose of carrying into effect the provisions of this article and with the approval of the board [of insurance], the Texas workers' compensation assigned risk pool is revised, amended, and continued as the . . . [F]acility"); § 2.04(a) (stating that the Facility's adoption, amendment and repeal of bylaws, rules and regulations are subject to approval by the Board); § 2.04(b) (stating that such adoption, amendment and repeal become effective on approval of the Board); § 2.04(c*)* (stating that "[a]ll bylaws, rules, and regulations of the [F]acility shall be subject to the continuing jurisdiction of the [B]oard"); *see also Southwest-Tex Leasing Co., Inc.*, 943 S.W.2d at 956 n.1 (explaining that the "Insurance Code directs

13

that the rule was within the purview of the Department's authority to regulate servicing companies. It points to provisions in the Facility's former governing statute that specifically concern the Department's authority regarding the servicing companies. That statute gave the Department the power to "establish standards, qualifications, requirements, and all other particulars regarding servicing companies necessary to service the fund adequately." *See* art. 5.76-2, § 4.08(a).

Further, the Comptroller provided evidence that the Facility's reimbursement obligation was consistent with the legislative scheme of rejected risk insurance. The legislature decreed that the Facility would bear all operating costs and expenses; according to the Comptroller, reimbursement was one of its expenses. *See* art. 5.76-2, § 2.06 (requiring the Facility to "pay all costs and expenses of operating and maintaining the [F]acility"). The same section iterates that "[f]unds of this state shall not be appropriated or expended for payment of any costs or expenses incurred in the operation or maintenance of the [F]acility." *See id.* The Comptroller argues that it would be in contravention of public policy to allow the Facility, after it has been legislatively terminated, to recover expenses it was obligated to bear when it was the statutory insurer of last resort. Although the legislation that authorized the conversion of the Facility into FIC protects the rights of the successor entity, it does not give the Facility greater rights now than those it possessed as insurer of last resort. *See* Act of June 1, 1997, 75th Leg., R.S., ch. 594, §§ 1.01-1.14, 1997 Tex. Gen. Laws 2076, 2076-79.[20]

---

servicing companies to issue policies on forms prescribed by the Facility and dictates that the policies are to be treated exclusively in accordance with rules adopted by the [Department]").

[20] Indeed, the same provision that authorizes the continued prosecution of lawsuits initiated by the Facility also provides that any such cause of action "continues to be governed by and conducted under Article 5.76-2, Insurance Code, as that article existed before its repeal, and the

The Facility responds that it is not seeking to recover costs or expenses of the Facility because it seeks a refund of *taxes*. The Comptroller again points out that the Facility never paid the surcharge, and also notes that it was recognized during the Facility's existence that the servicing companies were responsible for taxes on their premiums for business written through the Facility just as they were for their voluntary business. *See, e.g.*, *Aetna Cas. & Sur. Co. v. State Bd. of Ins.*, 898 S.W. 2d 930, 934-35 (Tex. App.—Austin 1995, writ denied) (quoting the Facility's Servicing Company Agreement, which states in part that "[a]ll costs and expenses incident to its functions as a Servicing Company and the servicing of risks assigned to it, including but not limited to office maintenance, salaries, personnel expenses, and the payment of premium tax and bureau assessments, shall be paid by Carrier" with the exception of authorized legal expenses).

In addition, the Comptroller produced evidence that the Facility treated the deficiency as part of its expenses. The Comptroller included with its motion a copy of the Facility's 1993 annual report. In the ledger, the shortfall in recoupment is listed as an expense. Its financial statements include "unrecoverable maintenance tax" in the "losses and expenses" column. In the "notes to combined financial statements," the Facility stated, "All costs and expenses of operating and maintaining the Facility are the responsibility of Facility members. Annually, an assessment is made by the Facility to each member to recoup costs and expenses of the Facility not covered by operations." Under the heading "Maintenance Taxes," the Facility explained that "[b]ecause of declining premium volume, the Facility anticipates that a portion of the amount applicable to Facility

---

applicable bylaws, rules, and regulations of the facility, as amended by the converted facility." Act of June 1, 1997, 75th Leg., R.S., ch. 594, § 1.06(f), 1997 Tex. Gen. Laws 2076, 2077.

business will not be recovered and, accordingly, has included charges . . . in the . . . statements of operations." Therefore, the Facility's own conduct and the policy expressed in its former governing statute prohibit us from reaching the result the Facility desires.

Furthermore, the Facility has admitted that it has already assessed its member companies for the deficiency between the amount it reimbursed the companies and the amount it recouped from its insureds. It then entered into assignment agreements with its former members; under the agreements, the companies assigned their right to any refund of the surcharge to the Facility and thus the Facility seeks the refund on its own behalf. If it succeeds on its claim for a refund, it will have been paid twice. The Facility responds that it *may* eventually return any refund it recovers to its former members who are now shareholders of the corporation that ultimately acquired the Facility. As shareholders, the former members may "receive dividends contingent upon [the Facility's] ability to collect certain receivables of in excess of $15 million" and have the right to "a special dividend on or before December 31, 2017." As the Comptroller points out, the dividend is speculative and may never be issued.

The Facility's governing statute prescribed the method for the Facility to recover its operating costs and expressly precluded the expenditure of public funds for such costs. *See* art. 5.76-2, §§ 4.04, 2.06. The Facility availed itself of this procedure during its existence as insurer of last resort and has recovered the shortfall from its members. To allow the Facility to recover part of its operating costs by an expenditure of public funds would give it a double recovery by a means that was expressly prohibited during its statutory existence. Policy and equity dictate that we must not allow this to occur.

16

*Tax Code § 111.104(f)*

The Comptroller also asserted as a basis for summary judgment that the Facility is not entitled to a refund in the first instance because it has failed to meet a necessary prerequisite: "[n]o taxes, penalties, or interest may be refunded to a person who has collected the taxes from another person unless the person has refunded all the taxes and interest to the person from whom the taxes were collected." Tex. Tax Code Ann. § 111.104(f) (West Supp. 2002). As noted, the Facility has assessed its members for the amount it was unable to recoup from policy holders. It has not made any refund to them pursuant to section 111.104(f). It would like to use any refund it obtains in this lawsuit to issue a dividend to its former members; this contingent and future payment does not satisfy the express requirement of section 111.104(f). Moreover, the Facility offers no response to the Comptroller's argument that it has a duty to refund its members before it is entitled to pursue a refund from the Comptroller under section 111.104. We therefore find that section 111.104(f) presents an obstacle to the Facility's claim independent of the policy reasons discussed above and overrule the Facility's first issue.

Because the Comptroller has shown that it is entitled to judgment as a matter of law, we need not address the Facility's other issues on appeal.

## CONCLUSION

The legislature established the policy by which the Facility was obligated to operate as insurer of last resort in the involuntary market. Rule 1.411 validly implemented that policy. We hold that the servicing companies, not the Facility, paid the surcharge in question. For all the reasons

17

set forth in the opinion, we conclude that the Facility is not entitled to a tax refund and therefore affirm the judgment of the trial court.

_____

Bea Ann Smith, Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Puryear

Affirmed

Filed:   January 10, 2002

Publish